# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746

---

| | |
|---|---|
| Appellate Court Caption | HERMAN CALLOWAY, JR., and GWEN BROWN, Special Administrator of the Estate of Herman Calloway, Sr., Deceased, Plaintiffs-Appellees, v. BOVIS LEND LEASE, INC., Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-2746 |
| Filed | August 16, 2013 |
| Rehearing denied | October 3, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a consolidated action arising from an accident in which a father was killed and his son was severely injured when a trench at a construction site collapsed, the trial court properly denied the construction manager's motion for a judgment *n.o.v.* or a new trial, since no basis existed to disturb the jury's finding that the construction manager owed a duty of care to the deceased and his son, the accident was a foreseeable result of the failure of the construction manager's superintendent to stop the deceased and his son from working in the trench without protection, the jury's disparate findings on contributory negligence were not against the manifest weight of the evidence, and the award of damages was not excessive. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 05-L-8589, 06-L-2005; the Hon. Clare E. McWilliams, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Cremer, Spina, Shaughnessy, Jansen & Seigert, LLC, of Chicago (Francis A. Spina, Heather Kingery, and Patrick J. Giese, of counsel), for appellant. |
| | Michael W. Rathsack, of Chicago (Allen N. Schwartz, Amanda L. Brasfield, Craig P. Mannarino, and Michael W. Rathsack, of counsel), for appellee Herman Calloway, Jr. |
| | O'Connor & Nakos, Ltd., of Chicago (D. Jeffrey Comeau, of counsel), for appellee Gwen Brown. |
| Panel | JUSTICE PALMER delivered the judgment of the court, with opinion. Presiding Justice McBride and Justice Howse concurred in the judgment and opinion. |

## OPINION

¶ 1    This appeal arises out of consolidated injury and wrongful death lawsuits. At all relevant times, the Community Unit School District 200 (the District) engaged various entities for a construction project located at Wheaton-Warrenville South High School (the project). The District hired defendant Bovis Lend Lease as the construction manager for the project. The District also contracted with DuPage Top Soil, which then subcontracted with Hamilton Construction (Hamilton) for the installation of underground sewer and storm pipes.[1] On June 6, 2005, two of Hamilton's employees, father and son Herman Calloway, Sr. (Senior), and Herman Calloway, Jr. (Junior), were working in a trench as part of Hamilton's work on the project. The trench collapsed, killing Senior and injuring Junior. Plaintiffs, Junior and Gwen Brown, special administrator of Senior's estate (the Estate), each brought a negligence action against Bovis and the cases were consolidated for trial. A jury returned a verdict in favor of Junior in the amount of $8,587,591.97, subject to a setoff of $406,915.85. The jury also returned a verdict in favor of the Estate, awarded it $1,020,000 subject to a $97,275 setoff and found that Senior was 49% contributorily negligent. The $1,020,000 represented the recoverable damages awarded after the Estate's total damages of $2 million were reduced by the percentage of negligence attributed to Senior.

¶ 2    On appeal, Bovis contends that the trial court erred in denying its motion for judgment

---

[1]DuPage Top Soil is not a party to this appeal, having been dismissed from the case prior to trial.

notwithstanding the verdict and in failing to grant Bovis a new trial. For the reasons that follow, we affirm.

¶ 3        In its capacity as construction manager, Bovis was responsible for coordinating day-to-day activities on the project, including the work of all contractors and subcontractors. On the day of the accident, Hamilton was digging a trench to install a sewer line. The process typically involved a backhoe digging a trench and then a hole in the trench in which a trench box was to be placed. A trench box is a wooden or metal box that is placed in the trench in order to provide protection for workers against a trench collapse. The trench box is put in the trench and then a stone base is placed in the bottom of the trench. A backhoe is used to place the sewer pipes on top of the stone base. Workers are required to be in the trench to level or hand-grade the stone base, to detach the sewer pipes from the backhoe and to connect the segments of sewer pipe together inside the trench. On the day of the accident, the trench being dug had intersected with markings indicating a buried electric line. Work had stopped while the Hamilton crew attempted to locate the cable. It was at some point during this process that Junior and Senior were in the trench without a trench box when the trench collapsed. With this background in mind, we set forth the evidence presented at trial.

¶ 4        Jim Blowers was the senior superintendent for Bovis at the time of the accident. He testified that Bovis was the construction manager and that in that role it coordinated the day-to-day activities at the construction site. As the senior superintendent, Blowers was assigned to coordinate activities on the project and was at the site daily. Blowers was responsible for "the whole site" and walked the site daily to check on the progress of the contractors and subcontractors. He typically did not have the authority to direct the manner, method or means of a subcontractor's work and left those decisions to the subcontractor. However, Blowers had the authority to stop unsafe work that he observed. If he saw a subcontractor not following proper procedure or doing something unsafe, he would stop the activity and have a discussion with the foreman about his concerns and how the task could be done differently.

¶ 5        Blowers testified that Bovis provided a safety orientation to all subcontractors and contractors who worked on the project. The orientation involved reading through documentation, talking about specific things related to the project, reviewing a general list of "basic common sense rules" appropriate for the project and then watching a 15-minute safety video. Part of the documentation distributed to all workers on the project was a 34-page site-specific "Safety Plan" that Bovis expected all contractors and subcontractors to follow. Bovis superintendents were responsible for ensuring that all contractors and subcontractors followed that safety plan. Bovis also distributed a project orientation to all subcontractors and contractors. The orientation contained, among other things, a "trenching" section that Bovis expected all subcontractors to follow. That section stated that when working in a trench over five feet deep, all workers were required to use a "trench box" or to "slope" the side of the trench to avoid injury resulting from a trench collapse. Enforcement of the provisions in the orientation was within the scope of Blowers' job duties.

¶ 6        Blowers also testified that all of his contact with Hamilton was through Senior. Blowers and Senior met each morning to discuss the tasks Hamilton was going to perform and to ensure that Blowers and Senior were "on the same page." When Blowers arrived at site on the morning of the accident, he spoke with Senior about Hamilton's plan to dig a north-south

trench that day in order to lay sewer lines. Blowers told Senior to use proper trenching equipment because of the importance of safety. Senior did not mention that he planned to work without a trench box that day. Blowers left to check on work being done inside the school but returned later that morning and saw that work had begun on the north-south trench. No one was working in the trench at the time and he did not recall if a trench box was in the trench.

¶ 7 Blowers returned to the trench at approximately 2:45 p.m. He walked to the east side of the trench and saw two workers in the partially filled trench and Senior standing outside of the trench. Senior nodded to the workers and they walked out of the trench. There was no trench box in place at that time. Blowers asked Senior "what's going on here" because he was concerned about workers being in the deep trench without protection. Senior explained that he was concerned about the trench crossing a submerged power line and that he did not feel a trench box would fit into the trench. Blowers responded, "we got to do something about this" and told Senior that he needed to use some form of trench protection. Although he agreed he had the authority to do so, Blowers explained that there was no reason to shut the job down at that point because there was no one in the trench. Based upon his conversation with Senior, Blowers understood that no one was going to work in the trench without protection. Prior to the day of the accident, Blowers had never seen Hamilton employees working in a trench over five feet deep without protection and Hamilton workers had never previously disregarded his directives.

¶ 8 At this point a backhoe operator was finishing some cleanup in the trench and a front-end loader had just dropped a bucket of stone into the trench. The backhoe operator then swung the backhoe over to an area where the pipe was kept. Blowers explained that the backhoe was to his left and the north end of the trench was to his right. Blowers was approximately 10 to 12 feet away from the backhoe. Blowers did not see Senior give a signal to the backhoe operator to pick up the pipe and did not recall if Senior was standing beside him at this point or had moved somewhere else. Blowers watched as the men on the west side of the trench hooked the pipe to the backhoe, which took approximately 30 seconds. The backhoe operator then swung the pipe over to the trench and Blowers noticed that Senior and Junior were in the north end of the trench. He did not see them enter the trench and did not expect them to be there because he had just spoken to Senior about five minutes ago. Blowers thought, "what the hell are you doing down there? What's going on?" Shortly thereafter, the trench collapsed. When asked how much time elapsed between when he saw Senior and Junior in the trench and when it collapsed, he responded that it was "hard to say, *** it was certainly 30 seconds to, *** I can't remember exactly." Blowers testified that he did not recall what Senior and Junior were doing in the trench. He did not have any warning before the trench wall blew in and he was unable to call out to Senior and Junior before the collapse.

¶ 9 Blowers did not stop the work when the stone was being dropped in the trench or when the pipe was being hooked to the backhoe because he did not think that any workers were going to be in the trench. He explained that the stone and pipe can be placed without anyone entering the trench and that he "figured they were just going to drop the section [of pipe] in the hole without anybody down there." Blowers also believed that a trench box could have been used in the location of the collapse. At some point during this time, Bovis assistant

superintendent Andrew Staroske walked up to the trench and was there when it collapsed.

¶ 10 Blowers acknowledged that he gave a handwritten statement explaining the accident to the police on June 6, 2005. In that statement, Blowers said he observed Senior and Junior hand-digging in the trench to avoid the power line before the collapse. At trial, he testified that this was information he received from others and that he did not personally observe the hand-digging. Blowers gave a second statement several days after the accident. In that statement, he said that the stone bed was installed with an excavator. He further stated that Senior then asked the backhoe operator to hook up the next section of pipe and then at some point Senior and Junior reentered the trench and hand-graded the stone bed. He explained at trial that the hand-grading he referenced in the statement was during the 30 seconds between when he turned around and when the trench collapsed. In the statement, Blowers also indicated that the east side of the trench blew in within a minute or two after Senior and Junior entered the trench. At trial, Blowers testified that these one to two minutes was a reference to the entire period of time between when he approached the trench and spoke to Senior and when the trench collapsed.

¶ 11 Blowers acknowledged that a reason to have stopped work on the trench would be if he had observed men in the trench while unprotected. It was his duty as senior superintendent to stop the work if he saw men working in an unprotected trench and to yell stop. When asked if 15 seconds would have been enough time to yell "stop, get out" while he saw Senior and Junior in the trench, Blowers responded, "it certainly seems that way, yes." Blowers acknowledged that he did not yell "stop, get out" to Junior and Senior and, when asked whether that was a violation of his duties, Blowers responded "it could be interpreted that way, yes."

¶ 12 Blowers testified that in addition to himself, Bovis's designated safety coordinator Brian Gawlik, Bovis superintendent Rich Liebrock and Staroske were all responsible for safety oversight on the project. Hamilton employees had always followed the directives that Blowers gave them. This included two prior occasions when Blowers told Hamilton workers to put a ladder into a trench being dug and to take a couple of cracked pipes out of service. Blowers acknowledged that workers have to be in the trench to guide the pipes into place and to unhook the pipes from a backhoe before they are placed in the trench. Blowers further acknowledged that at certain times on the project men had been in the trench hand-digging prior to installing the pipe.

¶ 13 The project orientation created by Bovis had a section regarding trenching which indicated that an excavation over five feet deep would need a trench box or sloping. Blowers agreed that this showed that Bovis had authority to direct the means and methods of a subcontractor. He acknowledged that when he gave his first statement a couple hours after the accident, neither Junior nor Senior had been extricated from the trench and he did not know if either was alive. In that statement, he did not mention the conversation he had with Senior near the trench about needing trench protection.

¶ 14 Andrew Staroske testified that the day of the accident was his first day working on the project for Bovis. He reported to Blowers that morning and was there to familiarize himself with the site. As a construction manager, Bovis's role was to "ensure the contractors

performed within their safety requirements." Bovis could stop a subcontractor's work if it believed a subcontractor was not following a site-specific safety requirement.

¶ 15    Staroske testified that he went to the site of the accident twice in the morning and saw the trench box outside of the trench. Staroske returned to the trench a third time that afternoon. As he approached, he observed two Hamilton workers outside of the trench fitting a concrete pipe together and a backhoe clearing soil from the bottom of the trench. Approximately two minutes later, Blowers arrived at the area and joined Staroske on the east side of the trench. They discussed the challenge of the upcoming work inside of the school. The backhoe operator continued to clear materials from the bottom of the trench for another one to two minutes after Blowers arrived. The operator then began to attach cables to the pipe. At some point, Staroske saw some stone placed into the bottom of the trench and then observed two Hamilton workers enter the trench. Blowers was standing next to Staroske on the east side of the trench as the two men entered. After the two workers had gone halfway into the trench, Staroske observed Blowers walk around the backhoe to the west side of the trench and have a conversation with two to three Hamilton employees, one of whom he identified as Senior. The conversation lasted less than a minute and during this time the bucket of the backhoe was attached to the concrete pipe but the pipe was still on the ground. Blowers then walked back to the east side of the trench where Staroske was standing. Blowers received a phone call and walked 15 feet away to take the call.

¶ 16    At some point, approximately two minutes after Blowers' conversation with the Hamilton employees, Staroske observed two workers, whom he later learned to be Junior and Senior, enter the trench. They were not the same two workers that Staroske had previously observed entering the trench. Staroske did not know if Blowers saw Junior and Senior enter the trench as Blowers was still on the phone and was not standing next to Staroske. Staroske did not know the direction that Blowers was facing while he was on the phone. Senior and Junior walked to the bottom of the trench and appeared to be working on laying the pipe. The backhoe operator had lifted the pipe off of the ground but had not yet placed it into the trench. Staroske did not tell the backhoe operator to stop and he did not tell Junior or Senior to get out of the trench at this time. He also did not hear Blowers tell the backhoe operator to stop or tell Junior and Senior to get out of the trench at this time. Blowers then finished his phone call and returned to Staroske's side. Seconds later the top of the east trench wall began to cave in and Staroske yelled "get out." Staroske acknowledged giving a statement for the police less than two hours after the collapse in which he said that he and Blowers both yelled "get out" when the trench began to collapse.

¶ 17    Marc Morale, Hamilton's owner, testified that Senior knew to use trench protection when the trench was over five feet deep. Hamilton controlled the methods and means of its work. However, if Bovis saw Hamilton working in a manner it did not believe was correct, Bovis could tell Hamilton to stop working and to perform the task differently.

¶ 18    Steven Fournier, a licensed civil engineer, testified as plaintiff's construction safety expert. Fournier was familiar with accepted industry standards regarding trench and excavation safety. Fournier opined that, under those accepted industry standards, some form of trench protection is required for any excavation greater than five feet deep in order to protect workers inside the trench. That protection can be provided by a number of means,

including "sloping" the soil, a "trench box" or some other shielding device.

¶ 19    Fournier testified that industry standards required a construction manager who observed a potentially hazardous situation, such as workers in a trench over five feet deep without protection, to stop the work immediately. The construction manager should also speak to the person in charge of the particular crew and tell that person that the unsafe condition must be mitigated or eliminated.

¶ 20    A reasonably careful construction superintendent would know that the process of hand-grading to level the stone beds beneath the sewer pipes could not be done with a backhoe alone and that the process involved laborers entering the trench to grade the stone by hand. A reasonably careful construction superintendent should also know that when a trench is being dug to lay pipes and a submerged utility is encountered, workers must manually enter the trench and dig down to locate the utility.

¶ 21    Fournier testified that he was familiar with the responsibilities, duties and obligations of a construction manager concerning safety practices and monitoring of contractors and subcontractors on projects similar to the project in this case. Fournier opined that a construction manager under these circumstances had the duty to periodically inspect the work being done, to stop unsafe work until proper safety practices have been put in place and to monitor the safety practices of contractors and subcontractors.

¶ 22    Based upon his review of the materials in this case, it was Fournier's opinion that Bovis failed to conform to industry standards regarding its duties and responsibilities. Specifically, Bovis violated its safety duties by allowing people to work in an unprotected trench, by failing to stop the work despite a dangerous condition and by failing to require appropriate trench protection.

¶ 23    Fournier testified that Bovis had notice of the unsafe condition. Blowers saw workers in the unprotected trench and ordered them out of the trench. Blowers was subsequently standing next to the trench with Staroske and saw Junior and Senior in the trench again. Blowers and Staroske saw the stone being placed in the bottom of the trench, Junior and Senior hand-grading that stone and a backhoe connecting to a piece of pipe and moving it to the trench. This gave Blowers and Staroske notice that a section of pipe was going to be installed and the failure to stop the work at this point, which Blowers and Staroske had the opportunity to do, was a violation of industry standards. In Fournier's opinion, had Bovis complied with proper industry standards and properly exercised its supervisory responsibilities, Junior and Senior would not have been exposed to the unsafe condition or the trench collapse. Bovis had time to intervene because the process of dumping the stone into the trench, grading it and then lowering the pipe could not be done quickly. It was not sufficient for Blowers to tell Junior and Senior to get out of the trench. He also should have stopped work from proceeding until the trench was made safe and spoken to Senior about obtaining trench protection. Bovis also should have stopped the work when Blowers first arrived at the site and noticed two workers in the trench without protection. Had he done so, Junior and Senior would not have had the opportunity to enter the trench at a later time. In addition to failing to stop the work, Bovis violated safety standards when it watched and permitted Junior and Senior to enter the trench.

¶ 24    Fournier agreed that Blowers approached the scene and ordered Junior and Senior out of the trench and then spoke to Senior. According to Blowers' deposition, he told Senior that nobody was to be in the trench without protection. Fournier agreed that Senior and Junior violated safety standards when they entered the trench. Hamilton had the responsibility to provide trench protection, not Bovis. Senior was the foreman at the site and was charged with the safety of those working for him. Like Bovis, Senior also had the power to stop the dangerous work. Junior had the power to stop his work but could not stop work at the site generally. Although Bovis had the authority to stop the work, it did not have authority to tell Hamilton specifically how to correct the unsafe condition.

¶ 25    Bovis gave all of the subcontractors a project orientation. Junior and Senior signed the document, which stated that they would follow the guidelines for trenching procedures set forth by Bovis and the Occupational Safety and Health Administration (OSHA). Hamilton also had a safety manual that had a detailed identification regarding excavating trenching which indicated that trench protection was required for any trench greater than five feet deep. Junior and Senior should have known of the need for trench protection under the circumstances of this case. Junior testified that he did not think it was unsafe and Fournier testified that Senior exposed Junior to the unsafe condition. It was a deviation from standard practice for Senior to reenter the trench after being ordered out by Blowers. As for Junior, Fournier understood that he reentered the trench at the direction of Senior. To the extent Senior ordered him to reenter, it was reasonable for Junior to do so. If Senior did not order him to reenter, then it was unsafe and a deviation from standard practice.

¶ 26    Fournier further testified that although it was insufficient for Blowers to just tell Junior to use trench protection, Fournier had no evidence that Hamilton had ever disregarded a directive from Bovis. For example, on prior occasions Bovis asked Hamilton to put a ladder in the trench, to change some gaskets and to remove some pipes that were cracked and not to start work until a certain time. All of these directives had been followed.

¶ 27    Steve Gromala was the Bovis project manager and handled all of the contracts for Bovis on the project, including Bovis's contract with the District. Gromala testified that Bovis created a site-specific safety plan for the project, which was signed by Bovis and each Hamilton employee and was to be followed by all contractors and subcontractors. Bovis's superintendents had the responsibility to ensure that all contractors followed the safety plan. Bovis was involved in the overall management and oversight of the project. As the project manager, Gromala expected Bovis safety personnel Brian Gawlik and John Ferguson to make safety inspection visits to the site. The safety plan identified Bovis safety officer Brian Gawlik as having overall safety control of the project. Additionally, all Bovis superintendents were at the site on a daily basis and had daily health and safety responsibilities on the project. Bovis created a project orientation manual for the project that included safety rules that were to be followed by all contractors and subcontractors as well as Bovis. Bovis's superintendents had a responsibility to take action if a contractor was not following the project orientation. If the superintendents did not take action when the procedures put in place by the orientation were not followed, they would not be doing their jobs and would be violating their duties. This was because the contractors were not free to do the work in a manner that was inconsistent with the procedures put in place by the project orientation.

Thus, the superintendents had a responsibility to intervene in order to ensure compliance with the Bovis project orientation. Gromala also expected Blowers, Staroske and Liebrock to walk the site as often as necessary to keep themselves apprised of the quality and safety of the work.

¶ 28    Kevin Franklin was a laborer for Hamilton and also Senior's son. He was working on the project on the day of the trench collapse. Work on the trench had stopped while the Hamilton crew attempted to locate the buried electric cable. Franklin saw a Bovis employee standing on the east side of the trench speaking to Senior "about the electric line." The trench box was then pulled out of the trench and Senior went and spoke to Junior and they both entered the trench with shovels to look for the power line. Blowers was standing close to the edge of the trench and watching as the trench box was removed and as Junior and Senior entered the trench and began digging for the power line. After watching Senior and Junior dig in the trench, Franklin turned away to hook the cable from the backhoe to a sewer pipe that was going to be put into the trench. This took about three to four minutes and when Franklin turned back around he saw Junior and Senior still digging in the trench and "the Bovis guy" talking on his cell phone while standing on the edge of the trench watching Junior and Senior dig in the trench. The next thing Franklin saw was the trench collapse onto Junior and Senior. Franklin did not see "the Bovis guy" "do anything" from the time Franklin saw Junior and Senior walk to the trench until the time Franklin turned back around after attaching the pipe. Franklin testified that Senior taught him to always use a trench box when digging in a trench that was deeper than five feet.

¶ 29    Henderson Calloway, Senior's son and Junior's step-brother, testified that he occasionally worked for Hamilton. Senior taught him to use a trench box if he was working in a trench over five feet deep. Henderson testified that from time to time his relationship with his father was strained and that there were periods of time when he did not see Senior for a year. However, Henderson's relationship with Senior was not strained at the time of Senior's death and he saw his father a few times from April to June of 2005. Henderson also testified that he was not aware of his siblings from Senior's other family until they were around six years old and Senior brought them to work.

¶ 30    Steven Giannini, Hamilton's backhoe operator, testified that the decision whether to use shoring or other trench protection was usually made by the foreman of the company doing the trenching. Giannini had never seen stone placed in a trench as bedding without men in the trench to hand-grade it and he was never able to install sewer pipe without men in the trench to guide the segments of pipe together. Prior to the accident, Giannini had never seen Hamilton employees working in a trench over 10 feet deep without trench protection. Giannini took his directions from Senior, who spoke to Bovis employees and superintendents on a daily basis. Bovis did not control the method or manner by which Giannini completed his work. Bovis had a safety orientation meeting the first day Giannini was on the job that he was required to attend. During the orientation, he spoke to a Bovis employee and watched a safety video. Senior spoke to Bovis employees on a daily basis.

¶ 31    Giannini dug a portion of a north-south trench on the morning of the accident. Hamilton workers could not get the sewer pipe in properly because of a manhole in the trench and they could not get the trench box to fit into the trench. Giannini never saw the trench box in the

trench on the day of the accident. Whether to use the trench box was a decision that would have ultimately been made by Senior. The other problem with using the trench box at this stage of the process was that the "cutters" on the edge of the box could sink into the ground and contact the buried electric line. After it was determined that the trench box would not fit, Junior and Senior entered the trench without protection. The only other person he recalled being present while Junior and Senior were in the trench without protection was "the Bovis representative," who was "pretty much always around." That representative stood on the east side of the excavation all day and watched the Hamilton employees working. Giannini did not hear this person give any directions to Hamilton employees. Giannini saw the Bovis representative speak with Senior several times on the day of the accident but could not hear what they were saying due to the noise of his machine. He did not see the Bovis representative make any hand gestures toward anyone working in the trench. Giannini did see the Bovis representative watching the unprotected Hamilton employees working in the trench. Giannini explained that when they were digging the trench on the day of the accident, he used the backhoe to dig for a bit and then Senior would hand-dig to look for the cable. Giannini did not know if, once they were past the manhole, the trench was wide enough to accommodate the trench box but the trench could have been widened had Senior asked Giannini to do so. However, Senior told him that they were not using a trench box that day.

¶ 32    Giannini was picking up pipe with the backhoe when he saw the trench collapse. The Bovis representative was standing on the east side of the trench at that time. Giannini did not remember how long the representative was standing there, but it was over 10 minutes. Senior and Junior had been in the trench for about one half hour before the collapse and Giannini did not remember if either came out of the trench during that time. He never saw the Bovis representative gesture to anyone working in the trench and Blowers never told Giannini to stop the work that he was doing.

¶ 33    Evan Kuhn operated the end loader for Hamilton on the project. His main task on the sewer installation project was to take dirt from the trench and load it onto trucks. He took his directions from Senior. He testified that based on his past experiences, hand-digging is usually necessary when looking for underground utilities and that a trench box would be used when digging below five feet. He believed a trench box could be used even when digging for a utility and that decision would be made by the foreman at the jobsite. Kuhn was standing on top of the backfill looking down into the trench when it collapsed. He did not know how long Junior and Senior were in the trench before it collapsed because they had been going in and out of the trench. Kuhn did not see anyone from Bovis standing near the trench when Junior and Senior entered the trench before the collapse.

¶ 34    Bovis was the construction manager and its superintendent would come by on a daily basis to observe the work being done and to make sure everything was going "smoothly." Kuhn did not take directions from the Bovis superintendent but instead only took them from Hamilton. Senior was the Hamilton employee who "called the shots" with regard to safety and Kuhn followed his directions.

¶ 35    On cross-examination, Kuhn testified that the Bovis representative could have been hidden from his view behind a machine and therefore could have been at the trench for more than 10 minutes before the collapse. He also testified that Hamilton did not give him any

safety training and that all such training was done by Bovis. The Bovis superintendent had the authority and responsibility to stop him from doing any work that was unsafe. The Bovis superintendent and Senior spoke several times a day about what work was going to be done on a given day and the progress of the project. Kuhn did not see Staroske speaking to Blowers by the trench before the collapse and he did not see Blowers speaking with Senior. He never heard the Bovis representative tell the men in the trench to get out or stop the work.

¶ 36    Dr. Steven Louis testified to the injuries Junior suffered as a result of the accident. Junior sustained multiple fractures to his pelvis, a ruptured bladder and damage to his arteries, muscles and nerves around the pelvic area. These injuries made his pelvis "unstable," meaning that half of his pelvis could "move independently in ways that it's not supposed to." Due to nerve damage, Junior was unable to flex his left foot upwards. Junior also suffered from impotence following the accident. Dr. Louis testified that his opinion, to a reasonable degree of medical certainty, Junior's muscle, nerve and bone injuries were caused by the trauma of the trench collapse.

¶ 37    Dr. Louis testified that he treated plaintiff's pelvic fracture by fixing the bones in place with plates and screws that were likely permanent. Junior complained of sharp pain down his leg and near his hips after the accident and was prescribed various narcotic and pain medications. At Dr. Louis's suggestion, Junior began treatment at a pain management clinic in 2006. Junior had his last visit with Dr. Louis in June 2007. Dr. Louis's impression at that time was that Junior's condition was not going to improve and that as a result of the accident he was permanently and totally disabled from any type of work due to his inability to stand, sit for any long time and/or do heavy labor. Dr. Louis also testified that he believed to a reasonable degree of medical certainty that Junior's pain, nerve damage and impotence were more likely than not permanent.

¶ 38    Dr. Timothy King, a pain management physician, testified that he had been treating Junior since August 2006. Junior was on pain medications when he began that treatment and Dr. King described Junior's pain as "bilateral back and hip in location with a burning type pain down into the calves and feet." Junior's numerical rating regarding his pain was 7 to 8 out of 10 and Dr. King stated this score reflected severe pain. Junior told the doctor that he had experienced that level of pain since the accident. At least part of Junior's pain was nerve-related. Dr. King outlined numerous medical procedures that were implemented in order to reduce Junior's pain and testified that the pain could be managed but not cured. Dr. King further testified that Junior's pain and physical conditions remained essentially unchanged since August 2006. Junior still exhibited bilateral leg burning, axial back pain and pelvic pain and continues to require the use of pain medications. Dr. King stated that Junior was "still pretty nonfunctional," and that he did not believe Junior could ever return to work as a construction worker.

¶ 39    Junior testified that he had been a construction worker since a young age and that he never received any formal training but learned construction on the job. Junior attended an orientation provided by Bovis before he began work on the project. His task on the project was to install sewer pipes. He did not have authority to direct how the work was to be performed or to stop others from performing their work. On the day of the accident Junior was placing sewage pipes into the trench. Junior testified that two workers needed to be in

the trench to guide the concrete pipe into the correct position as the backhoe could not do this task by itself. Work was very slow on the trench that day because of concern that the backhoe could hit the submerged power line. The trench therefore had to be dug by hand. Shortly before the collapse, Junior and Senior were probing for the power line and the trench box had been taken out of the trench because it would have hindered the probing process. The trench box was also deemed too big to fit into the trench due to the presence of a manhole. Junior testified that he knew that any trench over five feet deep posed a risk to his safety. However, he also testified that he did not think going into the trench was unsafe because the ground in the area of the trench was primarily composed of clay.

¶ 40    Junior saw Blowers near the trench when he and Senior were probing for the electrical line. Junior saw Blowers two to three times every day at work but never spoke to him directly. Instead, he took his directions from Senior, who did speak with Blowers numerous times each day. Blowers told Junior and Senior to get out of the trench. After they got out of the trench, Junior saw Senior speaking with Blowers but did not hear what was said. After Senior spoke to Blowers, he and Junior reentered the trench. Blowers watched as they did so and did not signal to them to get out of the trench and at no point before the collapse did he tell Junior and Senior to get out of the trench. After more probing for the electrical line, Junior and Senior began hand-grading the stone bedding after the backhoe dumped stone into the trench. The east wall of the trench caved in on top of them while they were doing so. Junior testified that he heard somebody yell for them to get out immediately before the trench wall collapsed.

¶ 41    Junior was in a type of sitting position near the concrete pipe when he was buried under the dirt. He testified that he could not see or hear anything, could not move and felt like he was suffocating. He was conscious during this experience and in excruciating pain. He yelled constantly while he was buried so that the workers would know his location when they were trying to dig him out of the trench. Kevin Franklin, Junior's brother, uncovered him and Junior was eventually extricated from the trench. He was taken to the hospital for surgery on his pelvis. He did not recall speaking with police after surgery.

¶ 42    Junior was eventually sent to rehabilitation and afterwards to another hospital. He was initially wheelchair bound after the accident. Through his efforts at rehabilitation he was eventually able to walk with the assistance of a cane. Junior eventually started seeing a pain management physician, Dr. King. Junior repeatedly testified that he had been in pain "to this day" from the injuries he sustained in the trench collapse. He could not work since the accident, was impotent and felt "pretty much worthless."

¶ 43    Gwen Brown Calloway was Senior's oldest daughter and Junior's younger sister. Brown testified that she spoke to her father once a week and saw him every other week. She enjoyed spending time with him. Brown witnessed Senior doing work around the house with his sons and teaching his sons work such as roofing and plumbing. Senior did not drink or smoke, was in good health and worked until the date of his death at the age of 74. On cross-examination, Brown testified that Senior had an estranged relationship with his son Henderson.

¶ 44    Junior's wife, Belinda Denise Calloway, testified that she had been dating Junior for over

10 years at the time of the accident. She described him as an interesting, quiet and "hard working man" who took pride in his work. Junior had no physical limitations before the accident. Belinda visited Junior in the hospital and saw that he was in "a lot of pain." She and Junior had a three-level home and after the accident numerous accommodations had to made to the house. These included a ramp to get into the house and "stair lifters" so Junior could get to different levels of the house. Junior could not walk when he came home and "had to literally learn to walk all over again." Junior still could not do any tasks around the house such as vacuuming but he cooked several meals a month. Junior was left impotent by the accident and Belinda could see that Junior did not feel complete and felt humiliated by all of the treatments he had unsuccessfully tried. Junior's disabilities and limitations still affected him and left him frustrated and in pain.

¶ 45    Following deliberations, the jury returned a verdict in favor of Junior and Senior and found Senior 49% contributorily negligent. The trial court denied Bovis's posttrial motion. This appeal followed.

¶ 46    Bovis first contends that its motion for judgment notwithstanding the verdict should have been granted. A motion for judgment notwithstanding the verdict should be granted only when all the evidence, viewed in the light most favorable to the nonmovant, so overwhelmingly favors the moving party that no other verdict based on the evidence could stand. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 177 (2008). " 'This is clearly a very difficult standard to meet, limiting the power of the [trial] court to reverse a jury verdict to extreme situations only.' " *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 537 (2004) (quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994)). " '[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992)). " 'A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple*, 151 Ill. 2d at 452). " 'The [trial] court has no right to enter a [judgment notwithstanding the verdict] if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome.' " *Velarde*, 354 Ill. App. 3d at 537 (quoting *Maple*, 151 Ill. 2d at 454). This court reviews a trial court's decision to grant or deny a motion for judgment notwithstanding the verdict *de novo*; however, like the trial court, we must be careful not to usurp the function of the jury and substitute our own assessment. *Velarde*, 354 Ill. App. 3d at 537.

¶ 47    Plaintiffs' case was submitted to the jury on a construction negligence theory based on section 414 of the Second Restatement of Torts. See Restatement (Second) of Torts § 414 (1965). Section 414 provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to

exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965). Section 414 is an exception to the general rule that "one who employs an independent contractor is not liable for the acts or omissions of the independent contractor." *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 493 (2008). If the employer retains control over the operative detail of any part of the contractor's work, the employer is subject to liability as master under the principles of agency. Restatement (Second) of Torts § 414, cmt. a (1965). If the employer retains only supervisory control, *i.e.*, the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others, then the employer may be liable under section 414 unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others. *Id.*

¶ 48    When a principal contractor entrusts a part of the work to subcontractors but superintends the entire job through a foreman, the principal contractor is subject to liability if he (1) fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, (2) knows or should know the work was being so done, and (3) has the opportunity to prevent it by exercising his retained power of control. *Id.* cmt. b; see also *Wilkerson*, 379 Ill. App. 3d at 494 (stating the rule that when a general contractor entrusts work to a subcontractor but superintends the job himself or through a foreman, "the general contractor is subject to liability if he knows or reasonably should know that the subcontractor work is being performed in a dangerous manner and fails to exercise his power of control to stop the work" (citing Restatement (Second) of Torts § 414, cmt. b, at 387-88 (1965))).

¶ 49    However, the employer is not liable where:

"he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* cmt. c.

¶ 50    In a negligence action, the plaintiff must establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury to the plaintiff proximately caused by the breach. *Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003). Whether a duty exists under section 414 turns on whether the defendant entrusted work to an independent contractor and yet retained control of any part of the independent contractor's work. *Oshana v. FCL Builders, Inc.*, 2012 IL App (1st) 101628, ¶ 23; *O'Connell v. Turner Construction Co.*, 409 Ill. App. 3d 819, 822 (2011) (stating that only if the construction manager entrusted work to an independent contractor does the court reach the question of whether the construction manager retained control over any part of the independent contractor's work).

¶ 51    Bovis first argues that it did not entrust work to Hamilton. Bovis claims that it was only the construction manager and in that capacity it did not hire or enter into a contract with Hamilton.

¶ 52    Bovis's contention is based upon the recent decision in *O'Connell*. In that case, a school

district hired the defendant, Turner, as the construction manager to build a new high school campus. *O'Connell*, 409 Ill. App. 3d at 820. Turner and the school district entered into a contract which provided, among other things, that the construction manager " 'shall receive bids, prepare bid analyses and make recommendations to the Owner for Owner's award of Contracts.' " *Id.* The contract also provided that the construction manager " 'shall assist the Owner in preparing Construction Contracts and advise the Owner in the acceptability of Subcontractors and material suppliers proposed by Contractors.' " *Id.* Waukegan Steel, a trade contractor hired by the school district, subcontracted its work to Linden Erectors, plaintiff's employer. *Id.* at 821. Plaintiff was injured while working at the construction site and brought a lawsuit against Turner, claiming negligence under section 414. *Id.* Plaintiff alleged that Turner was liable for his injuries because it exercised significant control over the trade contractors, particularly with regard to safety. *Id.* The trial court granted summary judgment in favor of Turner and plaintiff appealed.

¶ 53     On appeal, the parties argued whether the scope of Turner's control over the construction site was an issue of material fact. The appellate court noted, however, that the prerequisite for applying section 414 was entrustment of work to an independent contractor by Turner and that absent such entrustment section 414 was inapplicable. *Id.* at 822. The court noted that the school district entered into a contract with Turner, that Turner drafted the contracts and handled the bidding process for hiring subcontractors but that the actual signatories on the contracts were the school district and the contractors and subcontractors. *Id.* at 823. On these facts, the court held that Turner did not entrust work to the contractors or subcontractors and that plaintiff's 414 claim failed as a matter of law. *Id.* The court reasoned:

> "While Turner may have aided the School District in drafting contracts or handling construction bids, unless Turner actually selected the contractors or subcontractors, something plaintiff does not claim, it cannot be said that Turner entrusted them with the work, absent which section 414 is inapplicable. It is therefore irrelevant for purposes of count I what control, if any, Turner exercised at the construction site, for control alone does not trigger liability under section 414." (Emphasis omitted.) *Id*.

¶ 54     The entrustment requirement in section 414, as well as the decision in *O'Connell*, has been discussed in recent federal court decisions. In *Henderson v. Bovis Lend Lease, Inc.*, 848 F. Supp. 2d 847 (N.D. Ill. 2012), the plaintiff was injured while working as an employee of USA Hoist, a subcontractor on the Trump Tower construction project. Plaintiff filed suit against Bovis, which was hired as the construction manager by 401 North Wabash (401), the owner of the Trump Tower, alleging that Bovis breached its duties under section 414. *Id.* at 848. Bovis moved for summary judgment, arguing that it was not liable under section 414 because it did not entrust work to USA Hoist.

¶ 55     The district court reviewed the relevant provisions of the contract between Bovis and 401. Bovis and 401 entered into a "Construction Management Agreement" which provided that Bovis would act as 401's agent and at 401's direction would execute all trade contracts. *Id.* at 849. The agreement made Bovis responsible for soliciting bids and assisting 401 in its analysis of the bids. The agreement provided that the " '[a]ward of each trade contract shall be made by [401], with the consultation and cooperation of [Bovis]' " and that, consistent with the Agreement, 401 " 'made all final decisions as to which trade contractors were

ultimately hired to do the construction work at the project.' " *Id*. Pursuant to the agreement, 401 decided to hire USA Hoist and Bovis signed the contract with USA Hoist in its capacity as 401's agent. *Id.* Relying upon *O'Connell*, Bovis argued that it did not entrust work to USA Hoist because it did not actually select USA Hoist and that the agreement did not give it final authority over USA Hoist's selection.

¶ 56　　The court began by stating that Bovis's "narrow view of entrustment is open to serious question" and reasoning:

> "If the lack of formal contractual hiring authority, standing alone, precluded a finding of entrustment, then a general contractor could evade § 414 liability by ensuring that its agreement with the project owner left such authority with the project owner. And if the project owner ensured that the agreement left final authority to control the work site with the general contractor, then § 414 would be negated in large part, if not entirely–the entrustment requirement would be satisfied with respect to the project owner but not the general contractor, while the control requirement would be satisfied with respect to the general contractor but not the project owner. It is doubtful that the Illinois courts would countenance such a facile evasion of the protections provided and policies implemented by § 414." *Id.* at 851.

¶ 57　　The court also stated that "[a]llowing general contractors to skirt the entrustment requirement in this manner, moreover, would be inconsistent with the Illinois courts' understanding of the control requirement [of section 414]." *Id.* The court noted that under Illinois law, whether control has been shown depends on whether the evidence shows that the principal actually engaged in detailed supervision or control of the subcontractor's means and methods of work. *Id.* The court observed that, applying this principle, "evidence of a general contractor's actual control over the work satisfies the control requirement even if the trade contract formally assigns complete control to the subcontractor." *Id.* The court reasoned that "there is no apparent reason why Illinois would adopt a different, more formalistic approach to the entrustment requirement." *Id.* at 851-52.

¶ 58　　The court ultimately found that plaintiff had failed to show entrustment "even if Bovis's narrow view were rejected." *Id.* at 852. While Bovis assisted in the selection of subcontractors, the ultimate authority over subcontractor hiring resided with the project owner. *Id.* According to the court, evidence that the subcontractor was responsible for soliciting bids and assisting the project owner in analyzing those bids, without more, was insufficient to survive a motion for summary judgment. *Id.*

¶ 59　　Finally, in *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394 (7th Cir. 2012), the plaintiff was injured while working on the Trump Tower construction project and brought suit against the construction manager, Bovis, asserting a theory of negligence. Bovis moved for summary judgment on the ground that it did not owe a duty of care to the plaintiff. *Id.* at 395. The district court granted that motion. On appeal, the Seventh Circuit Court of Appeals considered whether Bovis entrusted work to the independent contractor that employed the plaintiff. Bovis argued that like the construction manager in *O'Connell*, it did not entrust work to the independent contractor because it never entered directly into a contract with the independent contractor. *Id.* at 400. Instead, the owner of the tower contracted with the

-16-

independent contractor and Bovis signed the contract as the owner's agent. The court of appeals rejected Bovis's argument as being an "overread[ing of] *O'Connell*" and reasoned that Bovis selected the independent contractor and that it did not matter that it was technically acting as the owner's agent when it did so. *Id.* Thus, the court found that Bovis entrusted work to the independent contractor and reversed summary judgment. *Id.*

¶ 60    We recognize that none of these decisions are binding on this court. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) (under the doctrine of *stare decisis*, "the opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels"); *People v. Criss*, 307 Ill. App. 3d 888, 900 (1999) (even though decisions of the United States District Court and the Court of Appeals are not binding on state courts, they can be persuasive authority and can offer guidance to state courts).

¶ 61    Nevertheless, we agree with the reasoning expressed in cases such as *Henderson* that the issue of entrustment, like that of control, should be decided based upon whether the circumstances of each case show that the construction manager actually entrusted work to a subcontractor and not based upon a bright-line test such as whether the construction manager actually signed the contract with the subcontractor. As noted, the control requirement can be met with respect to a construction manager where evidence of the construction manager's actions demonstrates that it retained a sufficient level of control, even where the contractual language formally assigns control to the independent contractor. We see no reason why entrustment should be evaluated any differently. Thus, we find that the entrustment requirement can be satisfied when the totality of the circumstances demonstrate that the construction manager actually entrusted work to a subcontractor, even where the construction manager did not actually sign the contract with the subcontractor. Bovis's interpretation that entrustment can be satisfied only if it signed the contract with Hamilton is overly narrow and formalistic and we decline to adopt it. To do so would allow project owners, construction managers and general contractors to easily avoid the reach of section 414. For the reasons that follow, we find that there was sufficient evidence in the record, together with the reasonable inferences to be drawn therefrom, to create a question of fact for the jury as to whether Bovis entrusted work to Hamilton.

¶ 62    The contract between Bovis and the District was a "Standard Form of Agreement Between Owner and Construction Manager where the Construction Manager is NOT a Constructor." Bovis and the District added a provision to the contract by which the District delegated to Bovis the authority to represent it on the project by acting as its agent. Section 1.1.3 of the contract specifically provides that Bovis "shall act as Owner's agent in connection with the services provided by the Construction Manager as determined by the Owner under this Agreement." *Sojka* teaches that an act taken by a construction manager in its capacity as the owner's agent can be deemed an act of entrustment by the construction manager. Although Bovis did not sign the contract with Hamilton as the District's agent, as was the case in *Sojka*, this provision lends support to the notion that Bovis can be found to have entrusted work to a subcontractor based upon acts that it took as the District's agent.

¶ 63    Consistent with this general provision is a section of the contract that the District and Bovis added to the standard form contract entitled the "Competitive Bidding and Contract

Award." This section was not mentioned as having been included in the contract in *O'Connell* or in any of the federal decisions discussed above. It provides:

> "Upon completion of the Drawings and Specifications, the Construction Manager, acting as the Owner's agent, shall competitively bid all construction in accordance with 105 ILCS 5/10-20.21. *Construction manager shall recommend the lowest responsive and responsible bidder in each contract to the Owner and the Owner shall award and execute all trade contracts in accordance with the aforementioned statute.*" (Emphasis added.)

¶ 64 Section 10-20.21 of the School Code requires school boards "[t]o award all contracts for purchase of supplies, materials or work *** to the lowest responsible bidder, considering conformity with specifications, terms of delivery, quality and serviceability." 105 ILCS 5/10-20.21 (West 2010). The purpose of this portion of the statute is to provide protection for taxpayers of a particular school district from financially irresponsible contractors. *Best Bus Joint Venture v. Board of Education of the City of Chicago*, 288 Ill. App. 3d 770, 777 (1997). Under this section, a school board has a duty to award a contract to the lowest responsible bidder and that bidder has the right to be awarded the contract. *Compass Health Care Plans v. Board of Education of the City of Chicago*, 246 Ill. App. 3d 746, 751-52 (1992). The statute does not require the board to simply award the contract based upon the lowest bid. Instead, the school board specifies the criteria which bidders must meet in order to be considered a responsible bidder and the board has great discretion in determining the responsible bidder. *Best Bus Joint Venture*, 288 Ill. App. 3d at 778.

¶ 65 Through this section of the contract, the District delegated to Bovis the authority to act as its agent and to use its judgment to select the lowest responsive and responsible bidder for all contracts. Bovis was then required to recommend each bidder that it selected to the District. The District, in turn, was required to award the contract to that bidder pursuant to section 10-20.21 of the School Code. Based upon this section, the jury could have found that Bovis entrusted work to Hamilton because this section essentially gave Bovis the authority to select the bidder to whom each contract was awarded.

¶ 66 Other provisions in the contract support the conclusion that there was a question of fact as to whether Bovis entrusted work to Hamilton. For example, the District and Bovis modified the form contract to establish Bovis's increased role in selecting contractors and subcontractors. The form contract provided that "[t]he Construction Manager shall submit the list of prospective bidders for the Architect's review and the Owner's Approval." The District and Bovis modified that section to provide that "[t]he Construction Manager shall submit the list of prospective bidders for the Architect's Owner's [*sic*] *review and comment*." (Emphasis added.) By deleting the language "Owner's Approval," the parties gave Bovis the right to select the bidders for the project and gave the District the reduced role of only commenting on those bidders. The contract delegated numerous additional responsibilities to Bovis. For example, the contract required Bovis to "develop bidders' interest in the Project *** and conduct prebid conferences with prospective bidders." Bovis was also required to "receive bids, prepare bid analyses and make recommendations to the Owner for the Owner's award of contracts or rejection of Bids." Bovis further "assist[ed] the Owner in preparing Construction Contracts and advise[d] the owner on the acceptability of Subcontractors."

-18-

¶ 67    Based upon all of this evidence, the jury found that Bovis entrusted work to Hamilton. We cannot say the evidence so overwhelmingly supports a conclusion to the contrary such that the jury's finding cannot stand. Therefore, denial of Bovis's motion for judgment notwithstanding the verdict on this issue was proper.

¶ 68    Bovis next claims that its motion for judgment notwithstanding the verdict should have been granted because it did not retain control over the safety of Hamilton's work. Bovis asserts that it did not "control or direct Hamilton's work in any way" and that its contract with the District limited its duties to control the safety of the work.

¶ 69    The facts of this case are analogous to those in two other cases in which the court found either a duty of care based upon retained control or a question of fact as to whether the general contractor retained sufficient control. In *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051 (2000), the court found the existence of a duty based on the general contractor's extensive oversight of safety on a large-scale construction project. Specifically, the general contractor provided 29 safety measures and procedures that subcontractors were required to follow, employed safety personnel to monitor the site for compliance with its safety guidelines, gave its own employees broad powers to halt any subcontractor work based on a perception of an unsafe working environment, required subcontractors to conduct safety training meetings that the general contractor's employees could monitor, and required subcontractors to participate in its own safety programs. *Id.* at 1063.

¶ 70    Similarly, in *Wilkerson*, 379 Ill. App. 3d at 497, the court found that there was a question of fact as to whether the general contractor retained sufficient control over the subcontractor's work and safety. This finding was based on evidence indicating that the contractor had the authority to stop the subcontractor's work in the event of a safety hazard. Other evidence of the general contractor's retained control included the subcontractor's contractual obligation to attend safety meetings and comply with the general contractor's list of 21 safety procedures, the subcontractor's obligation to submit for the general contractor's approval a site-specific safety plan and minutes of the subcontractor's own weekly safety meetings. *Id.*

¶ 71    We see no meaningful difference between the facts of this case and those in *Wilkerson* and *Bokodi*. Even if Bovis's responsibilities for controlling the safety of the subcontractors' work were limited by the contract, this is not dispositive because the control requirement can be satisfied by evidence that Bovis retained actual control over the safety of the work. *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 497 (2008) ("Although the contract between [the subcontractor] and defendant [general contractor] seemingly left to [the subcontractor] control of the operative details of its work and the safety of its employees, defendant's actions on the jobsite show defendant retained more than a general right of supervision.").

¶ 72    In this case, regardless of the contractual language, the other evidence presented at trial was sufficient to create a question of fact for the jury as to whether Bovis retained sufficient control over the safety of the subcontractors' work. That evidence established that as the construction manager, Bovis's role was to coordinate the day-to-day activities at the site and to ensure that all subcontractors and contractors complied with safety requirements. All

-19-

subcontractors were required to submit a site-specific safety plan to Bovis, which could stop a subcontractor's work if it was not following that plan. Bovis held a safety orientation, which included a safety discussion and a video, that all employees who worked on the project were required to attend. Bovis also provided a 34-page safety plan for the project that each Hamilton employee was required to sign. That plan gave Bovis overall control of site safety and appointed Bovis safety officer Brian Gawlik as having overall safety control on the project. The safety plan required all subcontractors to hold weekly "Tool Box Safety Meetings" and to provide copies of the minutes from those meetings to the Bovis superintendent. Bovis's superintendents were required to ensure that all subcontractors followed the safety plan.

¶ 73    Bovis also distributed a project orientation to the employees of all subcontractors, including Hamilton. Those employees were required to sign the orientation, which indicated that they were aware of the site conditions and would follow the guidelines set forth by Bovis and OSHA. The orientation contained safety rules that were required to be followed by everyone who worked on the project, including a section on trenching that required the use of a trench box or sloping when working in an excavation over five feet deep. According to Gromala, Bovis's project manager, Bovis's superintendents were required to intervene to ensure compliance if a contractor or subcontractor was not following the project orientation because contractors and subcontractors were not free to do work in a manner that was inconsistent with the project orientation.

¶ 74    Bovis's superintendents walked the construction site daily to ensure that subcontractors complied with the safety plan and all superintendents had daily health and safety responsibilities on the project. The superintendents had the authority and responsibility to stop any work that they saw being done in an unsafe manner and to direct that the work be done in a different manner. Finally, Bovis's safety personnel Brian Gawlik and John Ferguson visited the site to conduct safety inspections.

¶ 75    All of the evidence set forth above, when viewed in the light most favorable to plaintiffs, was sufficient to create an issue of fact as whether Bovis retained sufficient control over the safety of Hamilton's work such that it owed plaintiffs a duty of care. The jury found that Bovis retained sufficient control over safety so as to impose a duty upon it to exercise that control with reasonable care and we have no basis to disturb that determination.

¶ 76    Bovis next claims that its motion for judgment notwithstanding the verdict should have been granted because plaintiffs failed to establish proximate cause as a matter of law. Bovis claims that plaintiffs proceeded on their own to work in the unprotected trench while fully aware of the risks and that, after exiting the trench, they chose to reenter it "unbeknownst to Bovis." In effect, Bovis argues that its conduct did no more than furnish a condition by which plaintiffs' injuries were made possible and that Junior and Senior entering the trench was an unforseen intervening event. We disagree.

¶ 77    "[A] proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Kleen v. Homak Manufacturing Co.*, 321 Ill. App. 3d 639, 641 (2001). Proximate cause is composed of two distinct requirements: legal cause and cause in fact. *First Springfield Bank & Trust v.*

*Galman*, 188 Ill. 2d 252, 257-58 (1999). "A defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury." *First Springfield Bank & Trust*, 188 Ill. 2d at 258. Legal cause is a question of foreseeability, and the inquiry is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct. *First Springfield Bank & Trust*, 188 Ill. 2d at 258. Proximate cause may be established by inferences drawn from circumstantial evidence. *Housh v. Swanson*, 203 Ill. App. 3d 377, 381-82 (1990).

¶ 78        Whether a defendant's action or omission represented a breach of duty and whether such action or omission proximately caused the plaintiff's injury or death are generally issues of fact to be decided by a jury. *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). "The proximate cause of an injury can become a question of law only when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable [people] as to the inferences to be drawn from them." *Zerbenski v. Tagliarino*, 67 Ill. App. 3d 166, 172 (1978). For the reasons that follow, we do not find this to be such a case.

¶ 79        Even if Junior and Senior entered the unprotected trench with knowledge of the risks of doing so, as Bovis claims, this does not preclude a finding by the jury that Bovis's negligence was a proximate cause of plaintiffs' injuries. There can be more than one proximate cause of an injury and a defendant can be liable even when its negligence is not the sole proximate cause of plaintiffs' injuries, so long as its conduct contributed in whole or in part to the injury. *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 57 (1996). "The negligence of a defendant will not constitute a proximate cause of a plaintiff's injuries if some intervening act supersedes the defendant's negligence, but if the defendant could reasonably foresee the intervening act, that act will not relieve the defendant of liability." *Id.* A foreseeable intervening cause does not break the chain of legal causation and to avoid liability, a defendant must show that the intervening event was unforeseeable as a matter of law. *Id.* Where varying inferences are possible, foreseeability is a question of fact for the jury. *Id.*

¶ 80        In this case, there was evidence presented that prior to the accident Blowers watched Junior and Senior reentering the trench and hand-grading the stone before the collapse. According to Junior, he and Senior were grading stone in the trench for two to five minutes before the collapse and Blowers did not order them out of the trench during this time or stop the work. Even Blowers testified that Junior and Senior were in the trench for approximately 30 seconds before the collapse, that he did not order them out and that his failure to do so was a violation of his duties. There is no dispute that Blowers knew of the dangers posed by working in such a deep trench without protection. Under these circumstances, it cannot be said that Junior's and Senior's presence in the trench was unforeseeable or unbeknownst to Bovis. Moreover, the jury could have found that plaintiffs' injuries were a foreseeable result of Blowers failing to order Junior and Senior out of the trench and instead allowed them to continue to work in a 12- to 13-foot trench without any trench protection. Accordingly, Bovis's motion for judgment notwithstanding the verdict on the element of proximate cause was properly denied.

¶ 81        Bovis next contends that it was denied a fair trial when the trial court allowed Andrew Staroske's discovery deposition to be read into evidence at trial. Bovis claims it was prejudiced in that during the discovery deposition, its counsel asked few questions of

Staroske and did not rehabilitate him regarding the statements he made after the trench collapse. Bovis claims that its counsel would have questioned Staroske differently had it known the deposition would ultimately be used as evidence at trial.

¶ 82    "The admission of evidence is within the sound discretion of the trial court and a reviewing court will not reverse the trial court unless that discretion was clearly abused." *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). An abuse of discretion occurs when the court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would adopt the court's view. *TruServ Corp. v. Ernst & Young, LLP*, 376 Ill. App. 3d 218, 227 (2007). Additionally, we review *de novo* the portion of the trial court's ruling that involved an interpretation of the Supreme Court Rules. *In re Marriage of Zuberbier*, 309 Ill. App. 3d 386, 388 (1999).

¶ 83    The record shows that almost two years before trial, in early 2009, Junior filed disclosures pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007) indicating that he intended to call Staroske as an adverse witnesses. Junior also filed Rule 213(f) interrogatories asking Bovis to identify all lay witnesses who would testify at trial. In its response to Junior's interrogatories, Bovis identified "Andrew Staroske/Bovis Lend Lease" as a witness who would "testify to his employment with Bovis Lend Lease, Inc." Staroske was then deposed, at which time he was a superintendent. Bovis filed nothing thereafter to indicate a change in Staroske's status. Before trial, plaintiff served on Bovis an Illinois Supreme Court Rule 237 (eff. July 1, 2005) notice to produce Staroske. Bovis did not object. On January 14, 2011, just several days before trial, the parties appeared in court and Junior reiterated his intent to call Staroske. Bovis's counsel stated that he had not heard from Staroske and that plaintiffs should "drop the subpoena on him." Bovis's counsel then stated that Staroske had actually left the company six to eight months earlier, in June or July 2010. Junior noted that he made a Rule 213 disclosure in March 2009 indicating his intent to call Staroske and that he had adopted Bovis's Rule 213 disclosures. Bovis responded that it had no obligation to supplement discovery until it received the Rule 237 notice on January 4, 2011, and that it responded on January 7, advising Junior that Staroske was no longer an employee.

¶ 84    The trial court stated that the case was not going to be tried by "surprise" and that if Bovis knew that Junior relied on Staroske being with the company so that Bovis could produce him at trial and if Bovis knew that Staroske had left the company, the burden was on Bovis to produce him as a witnesses. Junior argued that his was a pattern of conduct by Bovis and that the same issue had arisen with other former Bovis employees he intended to call as witnesses.

¶ 85    The following day, Junior told the court that he received a telephone call from Staroske the previous night informing him that Staroske was in Abu Dhabi and would not be able to attend the trial. Junior asked the court to read Staroske's discovery deposition at trial in lieu of his live testimony pursuant to Illinois Supreme Court Rule 212 (eff. July 1, 2002) because Staroske was unavailable. The court stated that Staroske was "gone now" and that it would be extremely prejudicial to plaintiffs to deny them the ability to use Staroske's testimony given Bovis's failure to inform plaintiffs that he had left the company. Accordingly, the court allowed Staroske's deposition to be used and read into evidence pursuant to Supreme Court

Rule 212(a)(5).

¶ 86 Plaintiffs claim that the use of Staroske's discovery deposition was proper under Rule 212(a)(5) and as a sanction for a discovery violation pursuant to Illinois Supreme Court Rule 219 (eff. July 1, 2002). We cannot agree. Rule 212(a)(5) provides that discovery depositions may be used:

> "upon reasonable notice to all parties, as evidence at trial or hearing against a party who appeared at the deposition or was given proper notice thereof, if the court finds that the deponent is not a controlled expert witness, the deponent's evidence deposition has not been taken, and the deponent is unable to attend or testify because of death or infirmity, and if the court, based on its sound discretion, further finds such evidence at trial or hearing will do substantial justice between or among the parties." Ill. S. Ct. R. 212(a)(5) (eff. Jan. 1, 2011).

The rule specifically states that the deponent must be unable to testify due to death or infirmity. Here, Staroske was neither. He was instead out of the country and apparently unwilling to make himself available for trial. Rule 212(a)(5) does not support the use of Staroske's deposition.

¶ 87 Rule 219(c) provides that if a party fails to comply with the rules of discovery, the court may enter "such orders as are just." Ill. S. Ct. R. 219 (eff. July 1, 2002). Although Rule 219(c) gives a trial court authority to sanction a party for violating discovery rules, plaintiffs cite no authority for the proposition that use of a discovery deposition as evidence is a permissible sanction under Rule 219(c). We also cannot find that it is a permissible sanction under the rule when there is another supreme court rule that specifically governs the circumstances under which a discovery deposition can be used as evidence.

¶ 88 We do find, however, that the deposition was admissible as an admission by a party opponent. See *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 204 (2007) (appellate court may affirm the trial court's judgment on any basis appearing in the record, regardless of whether the trial court relied on that basis and regardless of whether the trial court's reasoning was correct). Supreme Court Rule 212(a)(2) provides that discovery depositions can be used "as an admission made by a party or by an officer or agent of a party in the same manner and to the same extent as any other admission made by that person." Ill. S. Ct. R. 212(a)(2). Similarly, Rule 212(a)(3) states that discovery depositions can be used "if otherwise admissible as an exception to the hearsay rule." Ill. S. Ct. R. 212(a)(3). Illinois Rule of Evidence 801(d)(2)(D) (eff. Jan. 1, 2011) states that a statement is not hearsay if "[t]he statement is offered against a party and is *** a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Ill. R. Evid. 801(d)(2)(D) (eff. Jan. 1, 2011); see also Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 801.21, at 832-34 (10th ed. 2010) ("In recognition of the reliability and reasonableness of admitting such statements, Ill. R. Evid. 801(d)(2)(D) now declares statements of an agent or servant concerning a matter within the scope of his agency or employment to be admissible as 'not hearsay' admissions of a party opponent if made during the existence of the relationship.").

¶ 89 Applying this test, we find that Staroske's deposition was properly admitted. Staroske

made the statements while he was still employed by Bovis as a construction superintendent. The statements also concerned matters within the scope of his employment. Staroske was a construction superintendent who, like all Bovis superintendents, was responsible for safety at the construction site. Therefore, his statements regarding safety observations that he made, which were the relevant portions of his discovery deposition, concerned matters within the scope of his employment. As such, we find that the statements were properly admitted through entry of his deposition into evidence.

¶ 90    Additionally, we find that any error in admitting Staroske's discovery deposition into evidence was harmless. Bovis raised the issue in its posttrial motion and the court reiterated that Bovis had failed to seasonally update its discovery and thereby denied plaintiffs the ability to take Staroske's evidence deposition or to secure his presence at trial. The court stated that even if Rule 212 was violated, it had "extensively poured over the testimony of Mr. Staroske and, in so doing, was able to compare and contrast the testimony with other witnesses at trial." The court continued that, "[t]o that end, virtually all of the relevant testimony offered by Mr. Staroske was at one time or another put forth to the jury via another witness." The court then listed approximately 13 portions of what it deemed to be "the most salient" statements in Staroske's deposition and listed portions of what was essentially the same testimony provided by other witnesses at trial.

¶ 91    We have also reviewed the relevant statements in Staroske's deposition and agree with the court's assessment that they were corroborated and testified to by other witnesses at trial. Contrary to Bovis's claim, Junior did not make Staroske's testimony the "cornerstone" of his closing argument. It is true, as Bovis points out, that one of the trial court's issue instructions stated that Blowers and Staroske were Bovis's agents and that any act or omission by either was an act or omission by Bovis. However, the focus of the evidence presented at trial and closing arguments was on Blowers' testimony and his acts and omissions that gave rise to Bovis's liability. We reject Bovis's claim that the error in admitting Staroske's deposition was compounded when the court allowed plaintiffs to "chop up" the deposition and to use only selected portions of it. Bovis provides no specific examples or descriptions of this being done or explain how this affected the impact of his testimony. Likewise, Bovis does not explain how allowing plaintiffs to "interpose contemporaneous objections at the trial to the previously recorded testimony" actually compounded the trial court's alleged error. For these reasons, we find that the admission of Staroske's discovery deposition into evidence did not substantially prejudice Bovis or affect the outcome of the trial and therefore does not require reversal of the jury's verdict. See *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 36 (2010) (stating that the exclusion or admission of evidence does not require reversal unless one party has been prejudiced or the result of the trial has been materially affected).

¶ 92    Bovis next contends that its motion for a new trial should have been granted on the ground that the jury's disparate findings on comparative negligence were against the manifest weight of the evidence.

¶ 93    Bovis pled the affirmative defense of contributory negligence against Junior and Senior. The jury was thus instructed that if it found Bovis liable, it was to assess the negligence attributable to Senior and Junior and reduce their recovery accordingly, or bar recovery if their fault is more than 50% of the total proximate cause. The jury found Senior 49%

contributorily negligent and found that Junior was not contributorily negligent. Bovis claims that it was against the manifest weight of the evidence and legally inconsistent for the jury to assign 49% fault to Senior and no fault to Junior as they had the same level of knowledge and engaged in identical conduct.

¶ 94    Contributory negligence is the failure to exercise that care which, under the circumstances presented by the evidence, a reasonably prudent person would take to avoid injury. *Pantaleo v. Our Lady of the Resurrection Medical Center*, 297 Ill. App. 3d 266, 283 (1998). The issue of contributory negligence is ordinarily a question of fact to be determined by the trier of fact. *Haist v. Wu*, 235 Ill. App. 3d 799, 816 (1992).

¶ 95    "If the [same] jury, on the same set of facts and circumstances, reaches two different factual conclusions as expressed by their verdicts, such verdicts will not support a valid judgment unless they are reconcilable under an applicable rule of law." *Redmond v. Socha*, 216 Ill. 2d 622, 642 (2005). The court will exercise all reasonable presumptions in favor of the verdicts, which will not be found legally inconsistent unless absolutely irreconcilable. *Id.* at 643-44. Moreover, the verdicts will not be considered irreconcilably inconsistent if supported by any reasonable hypothesis. *Id.*

¶ 96    The jury's findings regarding contributory negligence were not against the manifest weight of the evidence or legally inconsistent. Senior and Junior had different roles, responsibilities and levels of knowledge at the construction site and had different relationships with Bovis. Senior was Hamilton's foreman on the project and was charged with the safety of those working under him. Senior was also Hamilton's "competent" person at the site for trenching and it was up to him to select what type of trenching would be used. Senior had the authority to stop Hamilton's work at the project, whereas Junior only had the authority to stop his own work. Junior testified that he did not have authority to make decisions about the work and that Senior would not let him voice his own opinions or offer suggestions about work on a construction project. Junior took directions from Senior and it was Senior who was in charge of what they were doing.

¶ 97    Junior also testified that he did not think going into the trench was unsafe because the ground in the area of the trench was primarily composed of clay. He also explained that he was "there to do [his] job" that he was "paid to put pipe in" and that he "went back down there" to insert the pipe and do his job. According to Fournier, it was Senior who exposed Junior to the unsafe condition. Fournier testified that Junior entered the trench at the direction of Senior and that it was reasonable to do so under the circumstances. Fournier explained that "workers sometimes get exposed to conditions where they *** may know it's unsafe or they may not know its unsafe, but regardless they take direction from their supervisor." Fournier acknowledged that Junior should have known it was unsafe to be in the trench without protection but he explained that "workers are often placed in environments sometimes where they are exposed to conditions directed by their supervisors and they have a choice to either work in an unsafe manner or not work." According to Morales, Hamilton's owner, Junior would not be paid if he stopped working on a project.

¶ 98    Considering all of these facts and circumstances, the jury could have reasonably found that Senior was 49% contributorily negligent but that Junior was not contributorily negligent.

-25-

Accordingly, the jury's findings on contributory negligence are not against the manifest weight of the evidence. Similarly, as the facts and circumstances relating to Junior's and Senior's roles and responsibilities were different, we find that the jury's verdicts can be reconciled and are not legally inconsistent.

¶ 99 Bovis next contends that it was denied a fair trial by improper comments during closing arguments. Bovis acknowledges that it failed to make a contemporaneous objection to almost all of the complained-of remarks. Illinois law is clear that both an objection and a written posttrial motion raising an issue are necessary to preserve any error for appellate review. *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 287 (2009). Bovis's failure to object when the comments were made deprived the trial court of the opportunity to sustain an objection and cure any error. See *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 524 (1987) (where the jury hears an improper comment by counsel, the trial court's prompt action in sustaining an objection can cure the possible error).

¶ 100 Bovis claims that we should review the issue under the plain error doctrine. The plain error doctrine may be applied in civil cases, but it finds greater application in criminal cases. *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 375 (1990). "As civil trials do not implicate sixth amendment concerns, the application of the plain error doctrine to civil cases should be exceedingly rare." (Internal quotation marks omitted.) *Palanti v. Dillon Enterprises, Ltd.*, 303 Ill. App. 3d 58, 66 (1999). The doctrine is applied in civil cases "only where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." (Internal quotation marks omitted.) *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (2007).

¶ 101 We first comment on the insufficient manner by which Bovis presents its argument on this issue. In numerous instances, Bovis makes a general statement as to an improper argument by counsel and then simply provides a list of citations where the allegedly improper remark was made. For example, Bovis claims that counsel for Junior and Senior "accused Bovis of shamefully running from responsibility for Plaintiffs' injuries" and then cites to six different pages in the record. Bovis does not set out any of the specific instances where the improper argument was made, does not give any context to those instances and does not explain why counsels' remarks were improper. We find that Bovis has waived these specific claims for failure to adequately develop them. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (a point raised but not sufficiently argued is waived). We also note that although Bovis claims that the improper comments were "so egregious that the plain error standard applies," Bovis does not attempt to explain why the comments were so egregious that they denied Bovis a fair trial or substantially impaired the integrity of the judicial process. With this in mind, we will address only those allegedly improper remarks that Bovis has sufficiently presented.

¶ 102 Although improper argument and attorney misconduct can be the basis for granting a new trial, the determination as to whether allegedly improper remarks were so prejudicial so to require a new trial is left to the sound discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338 (1997). "In arguing a case to the jury, counsel is allowed broad latitude in drawing reasonable

inferences and conclusions from the evidence." *Friedland v. Allis Chalmers Co. of Canada*, 159 Ill. App. 3d 1, 5 (1987). Even improper arguments will not warrant reversal without a substantial showing of prejudice. *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 397 (2000). Parties are entitled to a fair trial, not a perfect trial. *Buczyna v. Cuomo & Son Cartage Co.*, 146 Ill. App. 3d 404, 420 (1986).

¶ 103     Bovis first claims that Junior's counsel improperly accused Bovis of "engaging in a corporate conspiracy" with the following line of argument:

> "At the time Jim Blowers wrote this statement, he didn't know if Herman Sr. was alive or dead. Two days later, when he writes out the second statement we heard about, we see the first signs of the Bovis defense being mounted.
>
> In the day or so after the collapse, there are meetings of the Bovis corporate people, Steve Gromala, the project manager, couple of corporate safety personnel and, or course, Mr. Blowers.
>
> By now, it's known that Herman Sr. is dead. So now the story can be crafted to blame the dead guy. Now, since Herman Sr. isn't around to refute the story, we can claim that we told him not to go down there and he just disobeyed our instruction. He disobeyed our instruction and took his son down with him.
>
> That defense is not only implausible, its offensive."

Contrary to Bovis's claim, Junior's counsel never used the words "corporate conspiracy." Counsel was simply pointing out that Blowers made two statements about the accident and that the second statement was greater in detail and placed greater blame on Senior than the earlier statement. Counsel was further pointing out that the first statement, made on the day of the accident, was more believable as the second statement was made after Blowers knew Senior had passed away, and therefore could not defend himself against the statement, and after Blowers had met with other Bovis managers. Counsel was therefore properly commenting on the evidence and the reasonable inferences to be drawn therefrom. See *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008) (counsel may comment and argue on the evidence and any reasonable inferences that may be fairly drawn from the evidence).

¶ 104     Bovis next claims that counsel for Junior and Senior repeatedly referred to Bovis's corporate status. However, Bovis cites no authority for the proposition that such references were improper. We also find that the references to Bovis's corporate status were not prejudicial because they were isolated in nature and were not a central theme of the case. See *People v. Woods*, 2011 IL App (1st) 091959, ¶ 45 (allegedly improper comment was brief and isolated and did not deny defendant a fair trial).

¶ 105     Bovis next claims that Senior's counsel insulted the family of Bovis's counsel when he stated, "[Bovis's counsel] talked to you about family. I am glad I'm not his family." Even if this comment was improper, it was brief and isolated and did not deny Bovis a fair trial.

¶ 106     Bovis's final claim is that counsel for Junior and Senior accused Bovis of ordering plaintiffs into the trench and thereby "sacrificing them." Bovis's counsel actually objected to this argument, and the trial court overruled the objection. Viewed in context, counsel was simply arguing that plaintiffs had always followed orders and that they had no reason to enter

an unprotected trench if they were not ordered to do so. Counsel was also commenting on the evidence showing that shortly before the collapse, Blowers spoke to Senior near the trench and pointed in the direction of submerged power lines and that Senior and Junior then entered the trench without protection while Blowers stood and watched. While the remark that Bovis "sacrificed these two men" was unnecessary, it was also brief and isolated and did not deny Bovis a fair trial.

¶ 107 We further note that the trial court instructed the jury before its deliberations that closing arguments were a summary of what an attorney contends the evidence has shown and that the jury should disregard any statement or argument by an attorney that was not supported by the law or evidence. See *Atwood v. Chicago Transit Authority*, 253 Ill. App. 3d 1, 14 (1993) (court can cure error from improper remark by instructing the jury that counsel's arguments are not evidence).

¶ 108 Finally, when Bovis raised the issue of improper closing arguments in its posttrial motion, the trial court took great care to explain that it had observed the entire trial and that it did not find that any of the comments warranted a new trial. The court specifically observed:

"I was in the position as the trial judge to note the attitude and demeanor of counsel and the atmosphere of the courtroom. I had an opportunity to observe the method, the manner, the cadence, the delivery and the level of professionalism that took place in this courtroom during closing arguments.

There's no doubt that a certain level of acrimony existed, but at all times counsel conducted themselves professionally and with their clients' best interests in mind and well within the law.

There was nothing in plaintiffs' counsel's argument that deprived the defendant of a fair trial or impaired the integrity of the judicial process. This trial was a truth-seeking mission for all sides and the arguments did not constitute pervasive prejudicial comments that would mandate a new trial."

¶ 109 This court has previously explained that a trial court is in the best position to observe the trial and arguments by the attorneys and to determine if any remarks were improper and if they denied a party a fair trial. This court stated:

"The standard of reviewing a claim of improper argument is whether the argument was of such a character as to have prevented a fair trial. [Citation.] The trial court is in a unique position to gauge the effects of misconduct, having heard all of the testimony and arguments and having observed the parties and their effect on the jury. [Citation.] The attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record, and the trial court is in a superior position to assess and determine the effect of improper conduct on the part of counsel. [Citation.] *** Where, as here, the trial court tells the jury that closing arguments are not evidence, the scope and character of the arguments are left to the trial court and will not be reversed absent an abuse of discretion. [Citation.] In addition, if the trial was fair as a whole and the evidence was sufficient to support a jury's verdict, a case will not be reversed upon review. [Citation.]" (Internal quotation marks omitted.) *Wilbourn v. Cavalenes*, 398 Ill.

App. 3d 837, 855 (2010).

¶ 110    We next consider Bovis's argument that the damages awarded to Junior are excessive and contrary to the manifest weight of the evidence. The jury awarded Junior $2,500,000 for loss of a normal life and $5 million for pain and suffering. Bovis supports its argument by pointing to capabilities that Junior retained after the accident such as walking and doing some household chores. Junior responds by emphasizing his past and present suffering as well as his physical disabilities that were caused by his injuries.

¶ 111    An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience. *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). When reviewing an award of compensatory damages for a nonfatal injury, a court may consider, among other things, the permanency of the plaintiff's condition, the possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries. *Id.* at 114. The measure of damages is a question of fact to be decided by the trier of fact, and a reviewing court should not substitute its judgment for that of the trier of fact. *Marchese v. Vincelette*, 261 Ill. App. 3d 520, 529 (1994). "A reviewing court will order a new trial on damages only if the amount awarded bears no reasonable relationship to the loss suffered by plaintiff or is unsupported by the manifest weight of the evidence and the opposite conclusion is clearly evident." *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 96 (2008).

¶ 112    Junior and his two treating physicians, Dr. Louis and Dr. King, gave testimony at trial regarding Junior's injuries, his physical capabilities, and his past and future pain. Junior testified that he was buried by dirt in the trench for an hour while he was unable to move or see. He was also conscious during the experience and in excruciating pain due to his injuries. Dr. Louis testified that Junior suffered from a fractured pelvis, a ruptured bladder, and multiple injuries to the arteries, muscles, and nerves around his pelvis. The nerve injuries also caused a foot drop and impotence. Junior was initially wheelchair bound and after rehabilitation therapy he still required a cane for balance when walking long distances. Junior testified to having sharp pain down his legs and feet on a regular basis. Dr. King testified that Junior still requires pain medications to regulate the pain caused by his injuries and that the pain would never be cured. Both doctors and Junior testified that Junior was unable to do strenuous physical activities for prolonged periods of time. Dr. Louis described Junior as "totally disabled from any type of work" and Dr. King stated that Junior was "still pretty nonfunctional." Dr. King also stated that he did not believe Junior would ever be able to return to work as a construction worker.

¶ 113    The jury heard all of the above evidence as well as testimony regarding the physical capabilities that Junior retained after the accident. The jury was in the best position to observe the witnesses, to weigh the evidence and to determine an appropriate award of damages. We will not disturb the amount awarded by the jury. As this court has observed:

     "Reviewing courts rarely disturb jury awards. For good reason. We are in no better position to judge the appropriate amount of a verdict than are the 12 people who see and hear the arguments and the evidence. They use their combined wisdom and experience

to reach fair and reasonable judgments. We are neither trained nor equipped to second-guess those judgments about the pain and suffering and familial losses incurred by other human beings. To pretend otherwise would be sheer hubris." *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 207 (1996).

¶ 114 Bovis next claims that the trial court erred in admitting Junior's 2009-10 medical bills because "[n]othing was disclosed to Bovis prior to trial indicating the amount of these bills, or that this medical treatment occurred." In a similar argument, Bovis claims that the trial court erred in denying its motion *in limine* to bar Junior's claim for costs related to necessary future medical care and allowing Dr. Louis and Dr. King to testify to Junior's necessary future medical care. Bovis argues that the only evidence supporting these future medical expenses were the 2009-10 medical bills which were not timely produced.

¶ 115 We find both of these claims waived. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (a point raised but unsupported by argument or citation to the pages of the record relied upon is waived); *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 847 (2007) (a point raised but unsupported by reasoned argument or citation to the record fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is therefore waived). In this case, Bovis does not cite to the portion of the record where the disputed bills were admitted, does not indicate if it objected to their admission and, if it did object, does not set forth the trial court's basis for admitting the bills. Bovis also does not explain the nature of the bills, the testimony surrounding them or the circumstances it claims establish that the bills were not timely produced. Similarly, Bovis does not cite to the portion of the record where the trial court denied its motion *in limine* or explain the reason for the court's denial. Bovis also does not indicate if it objected when the disputed testimony was given and it does not even set forth the specific portions of the doctors' testimony it finds objectionable. It is not the duty of this court to search the record in order to reverse the circuit court's judgment. *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009). Based upon Bovis's failure to present a cohesive legal argument with citations to the pages of the record it relies upon, we find Bovis has waived these claims.

¶ 116 We next examine the damages awarded to the Estate for pecuniary loss. Bovis argues that a new trial on damages is warranted because of errors made by the trial court and because the damages awarded to the Estate are contrary to the manifest weight of the evidence.

¶ 117 Under the Illinois Wrongful Death Act (the Act), the jury may award damages that it deems fair and just compensation with reference to the pecuniary injuries resulting from such death, to the survivors of such deceased person. 740 ILCS 180/2 (West 2010). In discussing the compensation for "pecuniary injuries" under the Act, our supreme court noted that the term is interpreted broadly to include items of damage for deprivation of support as well as deprivation of the companionship, guidance, advice, love and affection of the deceased. *Bullard v. Barnes*, 102 Ill. 2d 505 (1984). A presumption of pecuniary loss to the lineal heirs is created by the relationship of the parties alone. *Hall v. Gillins*, 13 Ill. 2d 26, 31 (1958). This presumption applies when both the decedent and linear heirs are adults. *Cooper*, 153 Ill. App. 3d at 519.

¶ 118 Bovis raises three issues with regard to the damages awarded to the Estate. First, Bovis

claims that the trial court erred in precluding cross-examination of the Estate's beneficiaries regarding Senior having two separate families. The court precluded cross-examination on this issue on the grounds that the relationship between Senior's two families was irrelevant and highly prejudicial. Second, Bovis claims the court erred in precluding it from cross-examining Gwen Brown as to whether, after Senior's death, she required Tony Franklin, Kevin Franklin and Taisha Franklin (children from Senior's other family) to take a paternity test. Bovis argues that the precluded evidence was directly relevant to the relationship between the beneficiaries and Senior. We disagree.

¶ 119　　The scope and extent of cross-examination is committed to the trial court's discretion. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 46 (2010). To be relevant, evidence must establish a fact of consequence to the determination of the action: it must be material and have probative value. However, even if the evidence is arguably relevant it may still be excluded if it would confuse the issues or tend to mislead the jury. *Demos v. Ferris-Shell Oil Co.*, 317 Ill. App. 3d 41, 53 (2000).

¶ 120　　We consider these two claims together because they both involve the same misapprehension as to the relevance of the relationship between Senior's two families to the issue of pecuniary damages. Pecuniary loss in this case pertained to the loss of society and companionship that the beneficiaries shared with Senior, not with other beneficiaries, prior to his death. The nature of the relationships that Senior's beneficiaries had with each other has no bearing in determining pecuniary loss. Furthermore, allowing the cross-examination could have led to confusion of the pecuniary loss issue and potentially misled the jury by suggesting that the relationship between the two families was relevant to pecuniary loss. The trial court's instructions with regard to pecuniary loss adequately informed the jury as to the relevant considerations for this issue. For these reasons, we find that the trial court did not abuse its discretion by precluding cross-examination as to the relationship between Senior's two families.

¶ 121　　Bovis next claims that the jury's award of $2 million to the Estate for loss of society and companionship was contrary to the manifest weight of the evidence. Bovis argues that the testimony of Senior's children regarding their relationship with Senior was sparse, that three of Senior's children did not testify to their relationship with Senior and that Senior had a strained relationship with his son Henderson. Bovis further argues that there was no testimony concerning family outings or memories of time spent together.

¶ 122　　As stated above, the law recognizes a rebuttable presumption of pecuniary loss to the lineal heirs of the decedent. *Hall*, 13 Ill. 2d at 31. Defendants can rebut this presumption and the jury, in weighing the evidence and issuing a verdict, has the implicit right to not give credence to the presumption in light of contradictory evidence. *Cooper*, 153 Ill. App. 3d at 519. "A reviewing court will order a new trial on damages only if the amount awarded bears no reasonable relationship to the plaintiff's loss or is unsupported by the manifest weight of the evidence and the opposite conclusion is clearly evident." *Clarke*, 381 Ill. App. 3d at 96.

¶ 123　　The trial court instructed the jury that "where a decedent leaves sons and daughters, the law recognizes a presumption that the sons and daughters have sustained some substantial pecuniary loss by reason of the death. The weight to be given this presumption is for you to

decide from the evidence in this case." At trial Bovis attempted to rebut the presumption of pecuniary loss by introducing evidence regarding the alleged estranged relationship between Senior's two families and Senior's alleged estranged relationship with Henderson. Brown testified that she did not meet her siblings from Senior's other family until they were over 10 years old. Junior and Brown testified that Junior's relationship with Henderson was strained. Henderson also testified that there were periods of time when he did not speak with Senior and that he and the Senior "never did talk much."

¶ 124    The jury heard and considered all of this evidence before it awarded the Estate damages for pecuniary loss. The jury also heard evidence presented by the Estate regarding the loss of society and companionship that Senior's heirs suffered after his death. The trial court instructed the jury that in determining pecuniary loss, the jury could consider what instruction and moral training the decedent would have reasonably been expected to give to his children had he lived, his age, his sex, his health, his occupational abilities, and the relationship he had with each of his children. Gwen Brown testified that she personally witnessed Senior working with his sons around the house "all the time." Their activities included paving the alleyway near the house, laying concrete, roofing, plumbing, and working on vehicles. Senior also taught his sons how to do roofing work. All of Senior's children who testified at trial said that they missed and loved their father. Brown testified that she spoke to Senior once a week, saw him every other week and that she enjoyed spending time with him. Henderson testified that his relationship with Senior was not strained at the time of Senior's death and that he had spoken with Senior multiple times in the months prior to the accident. Senior still had full-time employment at the time of his death, working with his sons Junior and Kevin on a daily basis. Senior was in good health and did not drink or smoke. Based on this evidence, as well as the presumption of pecuniary loss, we cannot say that the jury's award was against the manifest weight of the evidence. See *Cooper*, 153 Ill. App. 3d at 519-20 (in addition to the pecuniary loss presumption, plaintiff established actual pecuniary loss of society and companionship by introducing evidence of close relationship with mother).

¶ 125    Bovis next claims that the trial court erred by granting Junior's motion *in limine* and barring Detective Delyne Mangier from testifying that Junior told her, "I don't know why my dad told me to go back down into that hole." The trial court precluded the testimony on the ground that it was inadmissible hearsay, a violation of the Dead-Man's Act (735 ILCS 5/8-201 (West 2010)), and generally unreliable.

¶ 126    A ruling upon a motion *in limine* rests in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). A trial court will not be found to have abused its discretion with respect to an evidentiary ruling unless it can be said that no reasonable man would take the view adopted by the court. *Id.* If a trial court commits an abuse of discretion, a new trial should be ordered only if the exclusion of evidence appears to have affected the outcome of the trial. *Id.*

¶ 127    We disagree that Junior's alleged statement that he did not know why his dad told him to reenter the trench was hearsay. Instead, it was an admission by a party opponent under Illinois Rule of Evidence 801(d)(2). That rule provides that a statement is not hearsay if it is offered against a party and is the party's own statement, in either an individual or a

representative capacity. Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011). Also, the Dead-Man's Act provides that the witness must be an "adverse party or person directly interested in the action." 735 ILCS 5/8-201 (West 2010). The Dead-Man's Act therefore does not apply because Detective Magnier was not an adverse party or a person directly interested in the action.

¶ 128    Nevertheless, we find that the refusal by the trial court to allow the evidence was harmless. Bovis seeks to utilize the statement to show the circumstances under which Junior and Senior reentered the trench and to allow the jury to infer that Junior knew the risks of doing so. Bovis claims that Junior was in a position to testify as to whether he made the statement and what he meant by it. Contrary to Bovis's claim, Junior testified that he was on morphine and other medication at the hospital and that he did not recall speaking to the police. Therefore, Junior could not testify as to whether he made the statement and what he meant by it. On the other hand, Detective Mangier testified that when he spoke to Junior at the hospital there was no indication that he was under the influence of narcotics or medication.

¶ 129    Reliability aside, Junior's somewhat innocuous statement does not illuminate the circumstances under which he and Senior entered the trench. There was also ample evidence that Senior was in charge at the construction site and that Junior took directions from him. In fact, Detective Magnier testified that Junior told him that his dad asked him to reenter the trench to hand-grade the stone. Further, there was abundant testimony provided by Junior, Founier and other witnesses that Junior knew that it was dangerous to enter a trench that was over five feet deep without trench protection. For these reasons, the trial court's ruling on the motion *in limine*, which prevented the jury from hearing Junior's statement, was harmless and did not change the outcome of the trial.

¶ 130    Bovis next claims that it was denied a fair trial by several rulings the trial court made with regard to jury instructions. The decision to grant or deny a jury instruction is within the trial court's discretion. *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 403 (2007). "The standard for determining whether the trial court abused its discretion is whether, taken as a whole, the instructions fully, fairly and comprehensively informed the jury of the relevant legal principles." *Id.* "As a general rule, a judgment will not be reversed where the jury instructions are faulty unless they mislead the jury and the complaining party suffered prejudice." *Id.* "A particular jury instruction given by the trial court is proper if it is sufficiently clear, fairly and correctly states the law, and is supported by some evidence in the record." *Rios v. City of Chicago*, 331 Ill. App. 3d 763, 776 (2002). "The question of what issues have been raised by the evidence is within the discretion of the trial court. The evidence may be slight; a reviewing court may not reweigh it or determine if it should lead to a particular conclusion." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995).

¶ 131    Bovis first claims that the trial court abused its discretion by allowing a specific provision into the Estate's issue instructions. Specifically, the jury was instructed that the Estate had to prove that Bovis acted or failed to act in a certain manner. One of the possible acts or omissions the jury was instructed on was that Bovis "[d]irected Herman Calloway, Sr. to work in the unprotected trench." Bovis claims that there was no evidence to support the

-33-

instruction.

¶ 132    Franklin testified that Senior and the Bovis representative were speaking near the trench and that Blowers then pointed to the trench. Senior and Junior then entered the trench carrying shovels while being watched by Blowers. Junior and Senior were hand-digging for a buried power line. The jury could have concluded based upon this evidence that Blowers directed Senior to enter the trench to look for the buried power line. Accordingly, the instruction was supported by some evidence and including it was not an abuse of discretion.

¶ 133    Bovis next claims that the court abused its discretion by giving the jury an instruction regarding insurance. The trial court gave the jury Illinois Pattern Jury Instructions, Civil, No. 3.03 (Supp. 2009) (hereinafter IPI Civil (Supp. 2009) No. 3.03), which states:

> "Whether a party is insured or not insured has no bearing on any issue that you must decide. You must refrain from any inference, speculation, or discussion about insurance.
>
> If you find for the plaintiff, you shall not speculate about or consider any possible sources of benefits the plaintiff may have received or might receive. After you have returned your verdict, the court will make whatever adjustments are necessary in this regard."

The instruction was given over Bovis's objection. The court stated that its concern was not with trial but instead was based on *voir dire* when several prospective jurors stated that they had experiences with relatives who had workmen's compensation claims. Bovis now claims the instruction was improper because the issue of insurance was not otherwise raised at trial. Bovis asserts that it was prejudiced because it was the only party to whom the instruction could have pertained.

¶ 134    The "Notes on Use" to IPI Civil (Supp. 2009) No. 3.03 state: "The Committee believes that this instruction should be given in all cases where insurance could play a role in the decision of the jury. With the wide prevalence of liability insurance, medical insurance[,] or government benefits such as Medicaid or Medicare, many jurors question the role of insurance in contested accident, medical negligence[,] or other cases." IPI Civil (Supp. 2009) No. 3.03, Notes on Use, at 8. Moreover, in *Auten v. Franklin*, 404 Ill. App. 3d 1130, 1148 (2010), the plaintiff was injured in a car accident and brought suit against the other driver and various surgical associations. Although the word "insurance" was not mentioned during trial, the jury was instructed pursuant to IPI Civil (Supp. 2009) No. 3.03. The court found this was not an abuse of discretion, reasoning that testimony that plaintiff's sizeable medical bills had been paid and that plaintiff and her husband were of modest means could lead to the inference that insurance was used to pay the bills. *Id.* The court also found that although there was no mention of the medical defendants having insurance, those defendants were not prejudiced where the instruction accurately reflected Illinois law that it is not relevant to a jury's deliberations whether a party has insurance. *Id.*

¶ 135    We reach the same result in this case. As the trial court noted, during *voir dire* several prospective jurors mentioned having relatives who had worker's compensation claims. The jury also heard that this was a construction-related accident involving significant medical bills that had been paid. The trial court could have reasonably concluded that the jury might speculate that insurance was used to pay those medical bills. Bovis was also not prejudiced

by the instruction. Bovis claims that it was prejudiced as it was the only party to whom the insurance instruction could pertain. To the contrary, the second part of the instruction specifically referenced that the jury should not consider whether plaintiff had insurance. Moreover, there was no mention during trial that Bovis was insured and the instruction told the jury that it was not relevant to its deliberations whether a party had insurance. The trial court therefore did not abuse its discretion by giving the jury IPI Civil (Supp. 2009) No. 3.03.

¶ 136    Bovis also claims that the trial court abused its discretion when it gave the jury the IPI Civil (2006) No. 55.00 series instructions. Those instructions are based upon section 414 of the Restatement and informed the jury what plaintiffs had to prove in order for Bovis to be found liable. These included that Bovis retained some control over the safety of the work and that Bovis acted or failed to act in a number of ways, including failing to stop Junior and Senior from working in the unprotected trench.

¶ 137    Bovis's claim that the evidence did not support these instructions is no more than a reiteration of its previous argument that its motion for judgment notwithstanding the verdict should have been granted. We have already rejected that claim and for the same reasons we find that the evidence supported giving the IPI Civil (2006) No. 55.00 series instructions and that the court did not abuse its discretion by doing so.

¶ 138    For the reasons stated, we affirm the judgment of the circuit court of Cook County.


¶ 139    Affirmed.